518 F.Supp. 538 (1981)
Michael P. REED, Plaintiff,
v.
FAMOUS BARR DIVISION, The May Department Stores, Defendant.
No. 79-1088C(5).
United States District Court, E. D. Missouri, E. D.
June 25, 1981.
*539 *540 Michael E. Hughes, St. Louis, Mo., for plaintiff.
John J. Moellering, St. Louis, Mo., for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
CAHILL, District Judge.
This is an employment discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., in which the plaintiff alleges that he was discharged because of his sex. Plaintiff seeks back pay, reinstatement, declaratory and injunctive relief, and punitive damages against defendant, his former employer, on the grounds that because his female supervisor resented males generally, she failed to properly train him in the same manner as she did females, and that because of her bias against him on account of sex, she then recommended that he be fired, and that defendant, in reliance on her recommendation, unlawfully discharged him because of his sex. Defendant denied plaintiff's allegations and claimed that defendant was terminated because his job performance was unsatisfactory. Additionally, plaintiff asserted that he was the target of other disparate treatment, and that defendant's rebuttal is only a pretext.
The case was heard by the Court, which now makes the following findings of fact and conclusions of law as per Fed.R.Civ.P. 52.

Findings of Fact
1. Plaintiff is a white male United States citizen.
2. Defendant corporation is authorized to do business in the State of Missouri, operating numerous retail department stores in the St. Louis metropolitan area, including one in the West County Shopping Center in Des Peres, Missouri, and another one located in the Plaza Frontenac Shopping Center in Frontenac, Missouri.
3. Plaintiff commenced employment with defendant on or about May 15, 1978, in the capacity of security officer at the West County and Plaza Frontenac stores. Plaintiff was a college graduate with previous experience in retail security, and had headed his own security firm for a short while. The defendant's assistant store manager believed at the time of plaintiff's hiring that he showed promise and would likely do well in his assignments. Under defendant's regular personnel policies, plaintiff was on a probationary period for his first 90 days of employment.
4. Plaintiff's duties as a security officer included patrolling or monitoring various areas of the store, being on the lookout for thefts, safeguarding valuable merchandise, and investigating internal theft.
5. Plaintiff worked in the security department of the two stores from May 15, 1978 until July 21, 1978 under the supervision of Security Manager Sharon Knisley. Knisley had been employed by defendant for four years in security work and had been a supervisor in security for two years. There were approximately 15 security officers working under the supervision of Knisley at the time plaintiff was employed by defendant.
6. Upon his initial assignment, plaintiff indicated his resentment at taking directions from a female supervisor and this resentful attitude was doubtless conveyed to Knisley.
7. During the period he was employed by defendant, plaintiff received training from Knisley and other experienced security personnel. The training consisted primarily of the experienced personnel walking with plaintiff as he performed his duties in the various assigned portions of the store.
8. Knisley concluded after about two months that plaintiff's lack of interest, inattention to duty, and his argumentative nature justified an unsatisfactory rating on his job performance review. This conclusion was based on her direct observation of his job performance, and on repeated instances of his failure to perform assignments as directed, as well as having public *541 debates and arguments on the selling floor of the store.
9. Knisley had discussed the problems relating to plaintiff's work performance with her supervisor, James Cody, on more than one occasion.
10. Finally, plaintiff was formally evaluated in July, 1978 by Knisley. Michael Hixon, an assistant manager at the West County store, was in attendance at this meeting. Knisley informed plaintiff that he was unsatisfactory and that therefore his probationary employment was being terminated. Defendant gave as the reason for the discharge his unsatisfactory job performance. Immediately after being notified of his discharge, plaintiff's response, complete with expletives, was that he (plaintiff) was going to "get" the supervisor's (Knisley's) job. The defendant terminated his employment immediately.
11. The Court finds that, in accordance with the testimony of James Cody, the defendant had long maintained a 90-day probationary period for all new employees, and that after the 90-day probationary period had been successfully completed, greater administrative protection would be accorded those employees, including requirements of notice and hearing before discharge.[1]

Conclusions of Law
1. The Court has jurisdiction of this matter under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. (hereinafter referred to as Title VII).
2. Plaintiff has brought this suit claiming in essence that he was unlawfully discharged by defendant because of his sex. The appropriate burden of proof standard in cases of individual employment discrimination is set forth in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as refined and reaffirmed in Furnco Construction Co. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).
3. Under the Court's decision in McDonnell Douglas, the complainant in a Title VII action carries the initial burden of establishing a prima facie case of employment discrimination. In a termination case such as this, the elements constituting plaintiff's prima facie sex discrimination case would be: (1) that plaintiff was a member of a protected class, (2) that plaintiff was the object of adverse action, and (3) that such adverse action befell plaintiff because of his sex. See Rivers v. Westinghouse Electric Corp., 451 F.Supp. 44, 17 FEP Cases 767 (E.D.Pa.1978). Where plaintiff makes out a prima facie case, the burden shifts to the defendant employer to prove that the employment decision at issue was based on legitimate considerations. Furnco Construction Corp. v. Waters, supra. An employer desiring to dispel any inference arising from a prima facie showing under McDonnell Douglas need only "articulate some legitimate nondiscriminatory reason ... for the action at issue." McDonnell Douglas v. Green, supra, at 802, 93 S.Ct. at 1824. Once the employer offers evidence of a legitimate nondiscriminatory reason for its action, the plaintiff can then offer evidence that the employer's stated reasons are pretextual. McDonnell Douglas v. Green, supra.
4. However, the Court finds that the defendant acted with legitimate business reasons when it terminated plaintiff's employment. Although the plaintiff showed great promise initially, his resentment at being supervised by a woman was made apparent to all, including the woman supervisor at the very beginning of his brief tenure. During the approximately eight weeks of employment, the plaintiff had numerous misunderstandings with his supervisor as to the interpretation of the instructions he received, did not fully carry out assignments, showed a general lack of cooperation, and perhaps most telling, displayed boredom and disinterest. When you consider *542 the facts that plaintiff did have considerable experience in this work, was a college graduate, and had supervised his own security firm, it seems a logical inference to believe that plaintiff was unhappy with the limited discretion and repetitive nature of his assignments while working for others whom he may have considered as less knowledgeable than himself. In simple terms, he was apparently "over-qualified" in a sense for the job, and therefore did not give it the attention and commitment that the job required.
5. The Court concludes that the public display by plaintiff of anger and disagreement, and the threat to "get" Knisley's job make his assertions that he was discharged by Knisley because he (plaintiff) was male not credible.
6. The Court finds that there was no disparate treatment in the training of plaintiff by the defendant, even though other female employees received more training from Knisley than plaintiff received. After all, plaintiff had much more formal education than most of the other employees, male or female, and further, had considerably more "security" experience. The defendant employed plaintiff, in part, because his education and experience would require less training than others. The evidence also showed that he received approximately the same number of hours in the company of other senior employees, though not necessarily with Sharon Knisley.
7. Defendant's decision to discharge plaintiff was not based on plaintiff's sex, but rather for unsatisfactory work performance, a legitimate business reason.
8. The plaintiff has argued that he had a perfect attendance record, that no complaints from customers were filed against him, and that he had made no erroneous arrests or been involved in any dishonesty. These are all fine qualifications as far as they go  but if the defendant believed, in spite of such good characteristics, that certain essential elements were still lacking from plaintiff's job performance, the disqualifications could well outweigh the positive traits, making plaintiff's job performance unsatisfactory. It must also be noted that the credibility of plaintiff's assertions were seriously eroded by his initial emotional response, replete with expletives and threats toward Knisley. Plaintiff's attitude seemed to the Court to be revengeful and exaggerated, and therefore his testimony must be carefully weighed in the light of all the circumstances of the case.
9. In summary, while the evidence does show that Sharon Knisley was a demanding and critical supervisor, her harshness knew no barriers relative to the sex of the harassed employee. Her ire fell on male and female alike. It is not the Court's function to correct mere managerial deficiencies if such there be here. It is only if the conduct complained of is constitutionally impermissible, based on discriminatory motives caused by race or sex that the Court should order corrective actions.
10. Title 42 U.S.C. § 2000e-5(g) in relevant part provides:
If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. (Emphasis supplied.)
11. Since the Court finds that defendant did not intentionally discriminate against plaintiff on the basis of sex, neither injunctive relief, reinstatement, or back pay will be ordered under 42 U.S.C. § 2000e-5(g).
12. In regard to attorney's fees, 42 U.S.C. § 2000e-5(k) states:

*543 Attorney's fee; liability of Commission and United States for costs

(k) In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.
Pub.L. 88-352, Title VII, § 706, July 2, 1964, 78 Stat. 259; Pub.L. 92-261, § 4, Mar. 24, 1972, 86 Stat. 104.
13. While attorneys' fees have been routinely awarded to a prevailing plaintiff in civil rights cases unless special circumstances render such an award unjust, the purpose of such policy, namely to encourage the vindication of civil rights through private litigation, does not support a similarly liberal policy for awarding attorneys' fees to a prevailing defendant, unless the plaintiff's action was frivolous, unreasonable, or without foundation. See Mosby v. Webster College, 563 F.2d 901, 905 (8th Cir. 1977); Wright v. Stone Container Corp., 524 F.2d 1058, 1064 (8th Cir. 1975); Guy v. Peaches Records & Tapes, Inc., 477 F.Supp. 656, 659 (E.D.Mo.1979), appeal dismissed, 604 F.2d 1108 (8th Cir. 1980); Equal Employment v. Fry-Wagner Moving & Storage, 465 F.Supp. 1214, 1218 (E.D.Mo. 1979). The Court is of the opinion that while plaintiff has overreacted emotionally, there is insufficient evidence before it to hold that his actions were not taken in good faith. While anger and poor judgment are factors to be considered by the Court in determining the good faith actions of plaintiffs in civil rights cases, they must be weighed against the totality of the circumstances. Subjective motivations, like all intentions, are often difficult to ascertain, and untoward punishment by the assessment of attorneys' fees against individuals claiming civil rights violations have precedential impact that is chilling and repressive. An award of attorneys' fees to defendants in cases such as this would discourage future meritorious litigation under Title VII. Wright, 524 F.2d at 1064. Accordingly, defendant's request for attorneys' fees is denied.
14. Accordingly, judgment is entered in favor of the defendant and against the plaintiff.
NOTES
[1] Obviously defendant could not discharge plaintiff for a reason constitutionally prohibited, even during the 90-day period. See, Van Leeuwen v. United States Postal Service, 628 F.2d 1093, 1097 (8th Cir. 1980); Elkin v. Roudebush, 564 F.2d 810, 812 (8th Cir. 1977).